FILED
COURT OF APPEALS
DIVISION II

2014 JAN 14 AM 9:26

STATE OF WASHINGTON

BY
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| TWINSTAR CREDIT UNION, | No. 43609-4-II |
| Respondent, | |
| v. | |
| TANANA L. CANZONI and AMAS CANZONI, wife and husband and the marital community composed thereof, | UNPUBLISHED OPINION |
| Appellants. | |

JOHANSON, A.C.J. – Amas Canzoni[1] appeals the superior court's order granting summary judgment to TwinStar Credit Union in this replevin and breach of contract action. *See* VRP (May 25, 2012) at 3, 9. Canzoni raises several issues. Holding that Canzoni's arguments have no merit, we affirm.

## FACTS

### I. CREDIT UNION'S COMPLAINT AND MOTION TO SHOW CAUSE

On March 8, 2012, TwinStar Credit Union (Credit Union) filed a "complaint for replevin/monies due" against Amas and Tanana Canzoni.[2] Clerk's Papers (CP) at 6 (capitalization omitted). The Credit Union alleged that the Canzonis had entered into a "VISA loan agreement" with the Credit Union, that they had failed to make payments, and that the

_____

[1] Tanana Canzoni, Amas Canzoni's late wife, was also a party to this action.

[2] Tanana Canzoni passed away in April 2012.

amount owing as of February 27, 2012, was $2,987.01. CP at 7. It further alleged that it had financed the Canzonis' car purchase and that the Canzonis' payments were delinquent as of November 12, 2011. The Credit Union asked the court to order a show cause hearing at which the Canzonis should be required to show cause why they should not turn the vehicle over to the Credit Union; the Credit Union also requested a deficiency judgment, interest on any judgment, and attorney fees and costs.[3]

In support of its complaint, the Credit Union attached the following documents:

(1)     A copy of a "VISA Credit/Debit Card Agreement—Acknowledgement," signed by Tanana Canzoni and naming Amas Canzoni as another authorized user. CP at 12. The agreement/acknowledgement stated:

> By signing below, I/we acknowledge receipt of and agree to the terms and conditions of the VISA Credit/Check Card Agreement and Disclosure applicable to the Card program. I/We grant the Credit Union a security interest in all of my/our share accounts, now and in the future, to secure my/our obligations under the Agreement.

CP at 12 (emphasis omitted)..

(2)     A copy of the "VISA Credit/Check Card Agreement." CP at 13 (some capitalization omitted). This agreement included a promise to pay and described what would occur if the Canzonis defaulted.

(3)     A copy of a "Disclosure Statement and Agreement" between the Credit Union and the Canzonis, which was signed by the Canzonis, and a copy of the related "Note and Security

---

[3] The Credit Union also attached a sworn and notarized statement from Diane Sokolik verifying the complaint on behalf of the Credit Union as allowed, but not required, under CR 11(a).

No. 43609-4-II

Agreement Provisions." CP at 20-21 (some capitalization omitted). This document included a security agreement stating that the Canzonis' vehicle was security for a $24,546.02 loan.

Also on March 8, the Credit Union filed a motion for order to show cause on the replevin issue. Attached to this motion was a sworn statement from Rachel Russell stating that (1) the Canzonis entered into a purchase agreement to purchase the vehicle, (2) the Canzonis had failed to pay as required under the agreement, (3) the Credit Union was the lawful owner and was entitled to possession, and (4) the vehicle's value was approximately $11,475. The statement identified Russell as "a representative of the plaintiff in this matter" but did not specify the basis of her knowledge or exact relationship to the Credit Union. CP at 27. The Credit Union noted a hearing on the replevin action for April 13.

## II. CANZONI'S RESPONSE AND ATTEMPTS TO DISCHARGE THE DEBT

On April 11, Canzoni filed an untitled document, stating: "THE RUNNING OF PRESCRIPTION ENDS HERE AND NOW. THERE IS NO ADEQUATE COMPLETE REMEDY AT LAW." CP at 35. Other than these two sentences, the rest of the document consisted of (1) several blank pages and Canzoni's signature as "General Executor, General Administrator for AMAS CANZONI ESTATE," CP at 43; and (2) a page with a United States Postal Service postage stamp in each corner, which stated,

### TRUST SPECIAL DEPOSIT

Notice as to declarative intent and purpose of this tendered payment under Trust Special Deposit order, ab initio, of the general grantor/payor/beneficiary and is to be credited to the depositor's account as accord and satisfaction and payment in full and discharge/extinguish any and all debts and all "liabilities".

CP at 44. That page was otherwise blank.

3

At the April 13 hearing, the parties addressed a service issue; the Credit Union formally served Canzoni in court. The superior court continued the matter until May 18.

On April 16, Canzoni mailed the Credit Union two checks (one for $3,200, the other for $12,816.11) drawn on an account with Olympia Federal Savings and with Anchor Savings Bank. On the front of each check, Canzoni wrote, "EFT[4] ONLY" and "FOR DISCHARGE OF

---

[4] Electronic Funds Transfer. An electronic funds transfer is:

any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone. Such term does not include--

(A) any check guarantee or authorization service which does not directly result in a debit or credit to a consumer's account:

(B) any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer;

(C) any transaction the primary purpose of which is the purchase or sale of securities or commodities through a broker-dealer registered with or regulated by the Securities and Exchange Commission;

(D) any automatic transfer from a savings account to a demand deposit account pursuant to an agreement between a consumer and a financial institution for the purpose of covering an overdraft or maintaining an agreed upon minimum balance in the consumer's demand deposit account; or

(E) any transfer of funds which is initiated by a telephone conversation between a consumer and an officer or employee of a financial institution which is not pursuant to a prearranged plan and under which periodic or recurring transfers are not contemplated;

as determined under regulations of the Bureau.

15 USCA § 1693a (footnote omitted).

DEBT." CP at 217. On the back of each check, he wrote, "NOT FOR DEPOSIT EFT ONLY," and "FOR DISCHARGE OF DEBT." CP at 218. He also signed the back of each check as an "AUTHORIZED REPRESENTATIVE," and wrote "WITHOUT RECOURSE" under his signatures. CP at 218.

On April 23, the Credit Union's counsel returned these checks to Canzoni and advised him that the Credit Union would not accept the payments because Canzoni's "additional endorsement stating 'authorized representative without recourse'" was placed improperly on the document and the "without recourse" language "could arguably mean that the Credit Union has waived its right to collect back the legal fees and costs expended." CP at 71. On April 29, Canzoni reissued "the two EFT instruments," correcting the apparent errors and a third "EFT instrument" for legal fees; each of these "instruments" were drawn on an account with Anchor Savings Bank. CP at 59, 219.

On May 9, Canzoni filed a document titled: "Reply re: Complaint for Replevin/Monies Due" and "Order to Show Cause re: Replevin."[5] CP at 46 (some capitalization omitted). In this filing, Canzoni stated that (1) he had acquired "secured financial interest[s]" in the VISA account and the vehicle by making payments on the credit card and the vehicle debt, and (2) because he had a "secured financial interest" the Credit Union could not repossess the vehicle without

_____

[5] Canzoni also filed a document entitled "Original Bill in Equity." CP at 79 (some capitalization omitted). This document appears to reiterate many of the arguments made in the "Reply," discusses his apparent "re-recording of motor vehicle title" in the name of the Amas Canzoni Estate, and accuses the Credit Union and its counsel of violating "their Oath of Office and their Duties as Public Officers." CP at 86. Other than one issue touching on the Credit Union's counsel's authority, Canzoni does not appear to raise any issues related to this filing in this appeal.

proving its case at trial. CP at 47. Canzoni also (1) objected to Diane Solkolik's statement verifying the Credit Union's original complaint as hearsay; and (2) objected to Rachel Russell's sworn statement, apparently because the statement did not establish that Russell had direct knowledge of how the Credit Union's loan or payments were "monetized" or funded. CP at 47. Canzoni then appeared to argue that although the Canzonis had signed "an alleged purchase agreement," there was no "proof" that the Credit Union "incur[red] any loss" because (1) there was no proof that the automobile "cost the bank a dime," and (2) the Credit Union was willing to "discharge [the] debt" and had done so because it had accepted Canzoni's "EFT instrument[s]." CP at 48.

In support of his arguments, Canzoni attached several documents: (1) an "Affidavit of Status," attesting to, among other things, his own "firsthand knowledge" of the facts, CP at 51; (2) an "affidavit of secured financial interest in tangible property," stating that he had a $40,000 secured interest in the vehicle based on his payments and other factors, CP at 54 (some capitalization omitted); and (3) a document titled, "EFT instrument AFFIDAVIT OF Amas Canzoni," in which Canzoni states that the Credit Union had accepted two "Electronic Funds Transfer (EFT) instrument[s]" from him to "discharge [the] debt" associated with the VISA account and the vehicle loan and that the Credit Union's acceptance of these instruments had fully discharged his debts. CP at 58-60. Canzoni also attached (1) a December 10, 2011 to January 9, 2012 VISA statement showing an ending balance of $3,037.98; (2) a Credit Union statement for the period February 1, 2012 through March 31, 2012, showing an outstanding balance on the vehicle loan account of $12,276.74.

6

On May 11, the Credit Union notified Canzoni that (1) the three EFT payments had been returned by Anchor Savings Bank because Anchor Savings Bank was unable to locate the account they were drawn on, and (2) it (the Credit Union) had reversed those payments from his accounts.

On May 15, Canzoni moved to postpone the May 18 hearing. Canzoni again alleged that the debts to the Credit Union had been "discharged." CP at 206. In support of this filing, he filed (1) a copy of an April 10, 2012 through May 9, 2012 VISA account statement reflecting a $3,139.91 "Payment EFT DEPOSIT," and a zero remaining balance on the account, CP at 209; (2) the May 11 letters and other documents from the Credit Union advising the Canzonis that their payments had been returned from Anchor Savings Bank; and (3) copies of the payment instruments Canzoni had issued to the Credit Union, drawn on Anchor Savings Bank. The superior court apparently rescheduled the hearing for May 25.

On May 17, the Credit Union filed a "[s]tatement" from Tami Clark, Account Solutions Officer for the Credit Union, addressing the EFT instruments or checks that Canzoni had presented for payment on his account. CP at 225. The "[s]tatement" is in the form of a letter to the Credit Union's counsel from Tami Clark, stating that Canzoni had mailed the Credit Union three checks, "with a signature endorsement and the words 'Not for Deposit', 'EFT only', 'For Discharge of Debt', and 'without recourse' on the back of each check." CP at 226. She stated that the checks were processed as electronic fund transfers on May 8, but that Anchor Savings Bank refused to process the payments because the bank was unable to locate a related account. The Credit Union later verified that the Anchor Savings Bank account the checks had been

7

drawn on had been closed in December 2007. Clark attached copies of the three checks to her statement.

On May 23, Canzoni filed a document titled, "Answer to Statement of Tami Clark[;] Motion for Discovery[; and] (Motion to Dismiss Summons and Complaint)." CP at 230 (some capitalization omitted). In this pleading, Canzoni acknowledged that the Credit Union had advised him that Anchor Savings Bank had returned his payment documents because the account they were drawn on was not found. He did not challenge Clark's statements. Instead, he appeared to argue that the Credit Union had improperly handled the "EFT instrument[s]" and that these documents discharged his debts to the Credit Union. CP at 233-34. He also stated, "Plaintiff or Contract Agents', TWIN STAR CREDIT UNION, including Tami Clark's opinion regarding the submitted EFT instruments is not fact or evidence before this court (*Trinsey v. Pagliaro*)[, 229 F. Supp. 647 (E.D. Pa. 1964)])."[6] CP at 234. He never challenged Clark's statement as hearsay. Canzoni also asserted that "DIANE SOKOLIK's, RACHEL RUSSELL's opinions do not represent facts provable in this court." CP at 234-35. In addition, he appeared to argue that the Credit Union had not presented any evidence of the contracts or agreements. Specifically, he asserted that there was no "genuine certified copy of a contract/agreement,

---

[6] *Trinsey* held, in part, that a defendant's motion to dismiss for failure to state a claim that is not supported by affidavits or depositions is incomplete because it asks the court to consider facts outside the record that have not been presented as required under Federal Rules of Civil Procedure 12(b)(6) (failure to state a claim upon which relief can be granted), and CR 56(c) (summary judgment). 229 F. Supp. at 649. It also held, "Statements of counsel in their briefs or argument while enlightening to the Court are not sufficient for purposes of granting a motion to dismiss or summary judgment." *Trinsey*, 229 F. Supp. at 649.

sworn and attested to by a responsible party legally authorized to contract on behalf of the aforementioned Plaintiff." CP at 231.

### III. MAY 25 HEARING AND SUPERIOR COURT ORDER

At the May 25 hearing, the Credit Union's counsel stated that he had received and reviewed Canzoni's filings; described the Credit Union's arguments and the evidence it had submitted to support the Credit Union's claims and to rebut Canzoni's arguments; and asked the superior court to issue (1) an order of replevin for the vehicle and a deficiency judgment pending determination of the vehicle's value, and (2) an order for "judgment on the VISA card." VRP (May 25, 2012) at 9. Although Canzoni responded by asking that the superior court allow his "paperwork [to] speak for itself," he did not challenge any of the Credit Union's evidence. VRP (May 25, 2012) at 9. Instead, citing generally to "the UCC and banking laws or regulations," he appeared to argue that the payment instruments he had given the Credit Union, were not properly processed and that these instruments had "discharged" his debts. VRP (May 25, 2012) at 10-12. Canzoni also mentioned his "motion for discovery," and asserted that he had "rebutted all [the Credit Union's] so-called facts" and that it was now the Credit Union's burden to "prove that these facts have any merit." VRP (May 25, 2012) at 11.

The superior court entered an order of judgment and replevin in the Credit Union's favor. The order awarded the Credit Union possession of the vehicle, a deficiency judgment once the vehicle was sold, a $2,987.01 judgment on the credit card debt, interest, costs, and attorney fees. Canzoni appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

Because it appears that the superior court considered the Credit Union's and Canzoni's motions as summary judgment motions, we apply the summary judgment standards on review.

> When reviewing a summary judgment order, we review the evidence in a light most favorable to the nonmoving party. *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 170, 736 P.2d 249 (1987). Mere allegations or conclusory statements of facts unsupported by evidence do not sufficiently establish such a genuine issue. *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 132, 769 P.2d 298 (1989). In addition, the nonmoving party "may not rely on speculation, argumentative assertions that unresolved factual issues remain, or on having its affidavits considered at face value." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). After the moving party submits adequate affidavits, the nonmoving party must set forth specific facts rebutting the moving party's contentions and disclose that a genuine issue of material fact exists. *Seven Gables*, 106 Wn.2d at 13, 721 P.2d 1.

*Discover Bank v. Bridges*, 154 Wn. App. 722, 727, 226 P.3d 191 (2010).

### II. CREDIT UNION'S COUNSEL'S STATEMENTS

Canzoni first argues that the Credit Union's attorney was acting as a witness during the May 25 hearing. We disagree. Our review of the record from the May 25 hearing shows that the Credit Union's counsel presented argument based on the evidence that was before the superior court. Accordingly, this argument fails.

### III. HEARSAY

Canzoni next argues that exhibits A (the VISA Credit/Debit Card Agreement-Acknowledgement and the VISA Credit/Check Card Agreement) and B (the Disclosure Statement and Agreement and the "Note and Security Agreement Provisions) attached to the Credit Union's original complaint were inadmissible because they were hearsay. Our review of

the clerk's papers and the verbatim report of proceedings does not show that Canzoni objected to these documents on hearsay grounds. Accordingly, he has waived this issue. RAP 2.5(a).

### IV. EXISTENCE OF CONTRACTS

Canzoni next appears to argue that the documents before the superior court did not establish any contractual agreements. Canzoni's argument is difficult to follow, but he appears to argue that the Credit Union did not show that it provided any "consideration," apparently because the Credit Union did not produce books showing that it paid anything out of its own assets to benefit the Canzonis. *See* Br. of Appellant at 12. But the Credit Union presented copies of the loan and VISA agreements that the Canzonis signed, Canzoni did not object to these exhibits in the superior court, Canzoni does not dispute that he or his wife signed these agreements, and nothing in the record shows that the Credit Union did not pay the vendors that accepted the Canzonis' credit card or the car dealer. This argument is without merit.[7]

### V. NO DISCHARGE OF DEBT

Canzoni next appears to argue that any debt to the Credit Union was discharged once the Credit Union accepted the payment instruments drawn on Anchor Savings Bank. We disagree.

---

[7] Canzoni also appears to assert that the contracts were not valid because the Credit Union did not sign them, but he does not present any argument related to this assertion. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290, *review denied*, 136 Wn.2d 1015 (1998); *see also* RAP 10.3(a)(6). To the extent Canzoni presents any argument, he reiterates his argument that the Credit Union gave no consideration. As stated above, we reject that argument. Furthermore, were we to address this argument, Canzoni does not show that the credit card and loan agreements were not valid unilateral contracts. And, to the extent Canzoni presents additional argument or issue in his reply, we decline to address arguments raised for the first time in a responsive brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

11

Canzoni attempted to pay his debts by issuing checks drawn on a closed account with Anchor Savings Bank. He appears to argue that these payment instruments were some form of legal tender, but he cites no law establishing that payment instruments, regardless of whether he characterized them as EFTs, drawn on a closed or non-existent bank account can discharge any debt. Accordingly, this argument also fails.

## VI. ADDITIONAL ARGUMENTS

Canzoni also appears to question the superior court's jurisdiction and to argue that (1) he was denied due process, (2) the superior court was biased, (3) the Credit Union's counsel failed to disclose his relationship to the Credit Union or to the court, and (4) the superior court denied him his right to discovery. For the most part, these claims are not supported by any argument, so we do not address them. *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration."), *review denied*, 136 Wn.2d 1015 (1998); *see also* RAP 10.3(a)(6). To the extent he is arguing that the superior court erred in granting summary judgment without first allowing him the additional discovery he requested in his May 23 filing, two days before the hearing, this argument fails. Although Canzoni briefly mentioned his discovery motion at the May 25 hearing, the superior court did not directly address Canzoni's discovery motion. We have, however, reviewed the discovery request and hold that none of the discovery items Canzoni requested were necessary to resolve this matter. His requests either related to materials the Credit Union had already disclosed or to matters that would have no bearing on the issues before the superior court.

No. 43609-4-II

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Johanson, A.C.J.

We concur:

Bjorgen, J.

Maxa, J

13